# In the United States Court of Federal Claims

No. 13-164 C
Filed under seal: November 26, 2013[*]
Reissued for publication: December 6, 2013

*******************************************

| | |
|---|---|
| | Central Contractor Registration, 48 C.F.R. § 52.204-7(a) (2013) (changing the name of the CCR to the "System for Award Management"); |
| | Pre-Award Bid Protest Jurisdiction (28 U.S.C. § 1491(b)(1)); |
| | Service-Disabled Veteran-Owned Small Business Set-Aside (15 U.S.C. § 644(g)(1)(A)(ii)); |
| | Standing; |
| | Federal Acquisition Regulations, |
| NEIE, Inc., | 1.102(b)(3) ("The Federal Acquisition System will . . . [c]onduct business with integrity, fairness, and openness."); |
| Plaintiff, | 1.102-2(c)(3) (fair and impartial treatment of contractors); |
| v. | 1.602-2(b) ("impartial, fair, and equitable treatment" of contractors by contracting officers); |
| THE UNITED STATES, | 3.101-1 (standards of conduct for government personnel); |
| Defendant. | 15.305 (evaluation of proposals); |
| | 16.504 (indefinite quantity contract); |
| | 19.1405 (SDVOSB set-aside procedures); |
| | 52.219-1 (voluntary certifications); |
| | 13 C.F.R. § 125.15(e)(1) (SDVOSB status determined at the time of an initial offer); |
| | 48 C.F.R. § 4.1201 (2012 and 2013) (representations and certifications); |
| | 48 C.F.R. § 52.204-13(b) (contractors responsibility for the accuracy of information in the Central Contractor Registration). |

*******************************************

---

[*] On November 26, 2013, the court forwarded a sealed copy of this Memorandum Opinion and Order to the parties to delete from the public version any confidential and/or privileged information, and note any citation or editorial errors requiring correction. No redactions were requested.

**William E. Hughes, III**, Whyte Hirschboeck Dudek S.C., Milwaukee, Wisconsin, Counsel for Plaintiff.

**Jessica R. Toplin**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**MEMORANDUM OPINION AND ORDER**

**BRADEN**, *Judge*.

This bid protest concerns allegations made by a service-disabled veteran-owned small business that the United States Environmental Protection Agency acted arbitrarily and capriciously and in bad faith when the agency determined the bidder to be non-responsible, proposed the bidder for debarment, and then declined to award the contract to any bidder.

To facilitate review of this Memorandum Opinion and Order, the court includes the following outline:

**I.      RELEVANT FACTS.**

    **A.      The Solicitation.**

    **B.      The Evaluation Of Service-Disabled Veteran-Owned Small Business Proposals, Initial Contract Award, And Subsequent Protests.**

    **C.      The Selection Process Resumed.**

    **D.      The Contracting Officer Issued A Determination Of Non-Responsibility.**

    **E.      The Contracting Officer Initiated A Proposed Debarment.**

    **F.      The Effect Of The Proposed Debarment On Plaintiff's Effort To Obtain A Certificate Of Competency.**

    **G.      The Agency's Decision To Terminate Plaintiff's Proposed Debarment But Not To Award The Service-Disabled Veteran-Owned Small Business Contract.**

**II.     PROCEDURAL HISTORY.**

**III.    DISCUSSION.**

    **A.      Jurisdiction.**

    **B.      Standing.**

C.    Applicable Standards Of Review.

D.    Whether The Contracting Officer's Determination Of Non-Responsibility
      Was Unlawful.

      1.    The Plaintiff's Argument.

      2.    The Government's Response.

      3.    The Court's Resolution.

IV.   CONCLUSION.

* * *

I.    RELEVANT FACTS.[1]

      A.    The Solicitation.

On April 15, 2009, the United States Environmental Protection Agency ("EPA") issued
Solicitation No. PR-R2-08-10085 (the "Solicitation") for proposals to provide emergency and
rapid response services ("ERRS"), including "fast responsive environmental cleanup services for
hazardous substances/wastes/contaminants/materials and petroleum products/oil for the EPA
Region 2 in the states of New York and New Jersey." AR Tab 1 at 150 (Performance Work
Statement). The Solicitation stated that the EPA intended to award three "Fixed-Rate, Indefinite
Delivery/Indefinite Quantity" contracts.[2] AR Tab 1 at 121. In addition, the Solicitation stated
that the award would be made on a competitive basis, pursuant to a small business set-aside. AR
Tab 1 at 121. The Solicitation also identified only the "Program Manager" and "Response
Managers" as key personnel. AR Tab 1 at 144–45. The third contract, however, was to be
"awarded based on competition restricted to service-disabled veteran-owned small businesses"
(the "SDVOSB Contract" or the "SDVOSB set-aside").[3] AR Tab 1 at 121. The Solicitation

---

[1] The relevant facts discussed herein were derived from the June 11, 2013 Second
Amended Administrative Record (AR 1–3209).

[2] According to FAR 16.504, "[a]n indefinite-quantity contract provides for an indefinite
quantity, within stated limits, of supplies or services during a fixed period." 48
C.F.R. § 16.504(a). These contracts are used "when the Government cannot predetermine, above
a specified minimum, the precise quantities of supplies or services that the Government will
require during the contract period." *Id.* § 16.504(b).

[3] The Small Business Act, Pub. L. No. 85-536, 72 Stat. 384 (1958), requires that the
President establish a Government-wide goal for participation by SDVOSBs at three percent of
the total value of all prime contract and subcontract awards each year. *See* 15
U.S.C. § 644(g)(1)(A)(ii).

expressly "reserve[d] the [EPA's] right to award only one contract[]" (AR Tab 1 at 141), and to "reject any or all proposals if such action is in the Government's interest." AR Tab 1 at 119.

**B.    The Evaluation Of Service-Disabled Veteran-Owned Small Business Proposals, Initial Contract Award, And Subsequent Protests.**

On May 19, 2009, NEIE, Inc. ("NEIE" or "Plaintiff") submitted a timely proposal in response to the Solicitation for the SDVOSB Contract.  AR Tab 3 at 271; AR Tab 4.  NEIE represented that it was "a full service hazardous waste management company operating in the Northeast and Mid-Atlantic Regions" of the United States, providing "premier ERRS service" within EPA Region 2.  AR Tab 3 at 276.  At that time, James Coleson, a service-disabled veteran, owned 100% of NEIE.  Am. Compl. ¶ 5.  NEIE identified James Coleson as a "Responsible Corporate Officer" and that his son, Chris Coleson, worked in Resource Management.  AR Tab 3 at 280.

In response to the Solicitation, the EPA received nine proposals; four of which were also candidates for the SDVOSB Contract.  AR Tab 13 at 1254.  On September 29, 2009, NEIE was advised that its proposal was in the competitive range for the SDVOSB Contract. AR Tab 43 at 1555.

On April 30, 2010, the EPA awarded two contracts: one to Environmental Restoration, LLC; the other to Kemron Environmental Services, Inc.  AR Tab 13 at 1277–78 (Source Selection Document); AR Tab 17 at 1305.  The EPA initially awarded the SDVOSB Contract to EarthCare Solutions, Inc. ("EarthCare").  AR Tab 17; *see also* AR Tab 13 at 1296–98 (Source Selection Document).

On May 6, 2010, NEIE filed a protest with the Contracting Officer ("CO") and the United States Small Business Administration ("SBA") challenging Earthcare's claimed status as a small business.  AR Tab 20.  On the same date, NEIE also filed a protest with the CO and the SBA challenging Earthcare's claimed status as a SDVOSB.  AR Tab 21.  On May 25, 2010, the SBA determined that EarthCare met the SDVOSB eligibility standards as of the date of the Solicitation.  AR Tab 24 at 1447–48 (May 25, 2010 eligibility letter).  On October 29, 2010, however, the SBA's Office of Government Contracting, Area II, issued Size Determination Nos. 2-2010-77 & 79, finding EarthCare to be "other than a small business" and ineligible for award of the April 30, 2010 SDVOSB Contract.  AR Tab 27 at 1470.  On January 12, 2011, the SBA Office of Hearings and Appeals affirmed this determination.  AR Tab 34 at 1513 (*Size Appeal of EarthCare Solutions, Inc.*, SBA No. SIZ-5183 (2011)).

During the period of January 2011 to March 2011, NEIE contacted the CO to ascertain the status of the April 30, 2010 SDVOSB Contract.  AR Tab 35 at 1516 (1/19/11) (requesting update on the "next step by EPA"); AR Tab 37 at 1518 (1/26/11) (requesting information, because NEIE was "contemplating closing [their] . . . satellite office"); AR Tab 38 at 1519 (Jan. 28, 2011) (voicing concern that EPA may not award the contract).  EPA responded that it was still in the process of making a decision and would provide an update when information became available.  AR Tab 37 at 1518 (1/26/11) (stating that EPA "should have an update . . . by the end of this week"); AR Tab 40 (2/8/11) ("[T]here is no update on the . . . contract at this time.").

On March 2, 2011, NEIE filed an agency level protest with the EPA to ascertain the status of the SDVOSB Contract. AR Tab 42 (expressing NEIE's concerns about reports that the EPA planned to "cancel the SDVO solicitation [and] re-issue the procurement"). On March 11, 2011, NEIE also filed a protest with the United States Government Accountability Office ("GAO"). AR Tab 43. On March 22, 2011, the GAO dismissed NEIE's protest as "speculative and premature." AR Tab 46A at 1685.3; *see also* AR Tab 47 at 1686, 1688. In April 2011, NEIE continued to inquire about the status of the SDVOSB Contract. AR Tab 48–54 (4/4–4/7/13 emails from Chris Coleson to the CO). On April 6, 2011, the CO responded that "there is no update . . . at this time." AR Tab 52; *see also* AR Tab 55 at 1701 (4/12/11 email from EPA Contract Specialist to Chris Coleson) ("[T]here is no update . . . at this time."). Another round of emails from NEIE to the EPA yielded no more information. AR Tab 57 (4/20/11 email from Chris Coleson to the CO and EPA Contract Specialist); AR Tab 58 (4/22/11 email from Chris Coleson to the CO explaining that, without a resolution, NEIE would soon need to layoff employees); AR Tab 59 at 1715 (4/22/11 email from the CO to Chris Coleson) ("[T]here is no update . . . at this time."). On April 12, 2011, NEIE asked United States Congressman Bobby Scott to inquire about the status of the SDVOSB Solicitation. AR Tab 56 at 1707–10. On May 16, 2011, EPA responded to Congressman Scott that EPA "expect[ed] to have a decision on [the SDVOSB Contract] within the next two months." AR Tab 60 at 1717.

On June 10, 2011, James Coleson died and ownership of NEIE was transferred to his son, Chris Coleson. AR Tab 123 at 2004; AR Tab 149.A at 2192.14. Thereafter, Chris Coleson asked the EPA again about the status of the SDVOSB Contract. AR Tabs 61, 62, 64 (6/23/11, 6/27/11, 7/6/11 emails from Chris Coleson to the CO and EPA Contract Specialist). Again, the EPA advised NEIE that "there is no change in the status of the subject procurement at this time." AR Tab 63 (7/29/11 email from the CO to Chris Coleson).

### C.    The Selection Process Resumed.

On July 22, 2011, the CO notified the three competitive range offerors for the SDVOSB Contract, *i.e.*, NEIE, Guardian Environmental Services ("Guardian"), and LATA-Kemron Environmental Response Services ("LATA-Kemron"), that the EPA was "proceeding with an award" of the SDVOSB Contract. AR Tab 68 at 1727 (email to NEIE); *see also* AR Tabs 66–67 (emails to LATA-Kemron and Guardian). On July 27, 2011, the CO contacted each offeror to confirm their interest in extending the final proposal revision acceptance periods for 90 days from August 10, 2011. AR Tabs 73–75, 77–79; *see also* AR Tabs 82–84 (clarifying that, because the proposals expired in June 2010, the offerors were being asked to extend the acceptance period). All offerors agreed to this extension. AR Tab 85 (LATA-Kemron); AR Tab 88 (Guardian); AR Tab 90 at 1809 (NEIE).

On August 9, 2011, however, NEIE filed a second GAO protest, arguing that the EPA intentionally withheld the fact that the prior proposals expired as of June 2010 and contending that this action was arbitrary and capricious and amounted to a "de-facto cancellation." AR Tab 89 at 1774. NEIE also alleged other improper procurement procedures had occurred. AR Tab 89 at 1770–82. On August 18, 2011, the EPA filed a motion for summary dismissal. AR Tab 95. On August 24, 2011, the GAO dismissed NEIE's protest as "speculative and premature," because the EPA informed the GSA that NEIE still had the "opportunity to compete for the SDVOSB award." AR Tab 99 at 1844. Thereafter, at the request of the CO, each offeror

submitted final proposal revisions.  AR Tab 109 (LATA-Kemron); AR Tab 107 (Guardian); AR Tabs 111–12 (NEIE).

On January 18, 2012, the CO "recommended that a fixed rate, performance based, indefinite delivery, indefinite quantity contract for a two year base period, two year award term, and a one year award term totaling $118,825,579.21 be awarded to NEIE, Inc." AR Tab 118 at 1980.  The EPA approved the award stating that "NEIE, its President, James Coleson [and] Vice President of Operations Christopher Coleson . . . are not debarred, ineligible or suspended." AR Tab 118 at 1979.

On January 19, 2012, EPA notified all offerors of the EPA's decision.  AR Tabs 120–22.

In turn, Guardian filed a protest with the CO challenging NEIE's SDVOSB status.  AR Tab 123.  Guardian alleged that NEIE was ineligible for the SDVOSB Contract, because:

1.  James Coleson died on June 10, 2011.  AR Tab 154 at 2354.

2.  NEIE's January 12, 2012 Central Contractor Registration[4] ("CCR") entry lists the Primary Point of Contact as Chris Coleson and the Alternate as James Coleson. AR Tab 123 at 1989.

3.  NEIE's January 12, 2012 SBA Profile lists James Coleson as President and Christopher Coleson as Business Development Manager. AR Tab 123 at 1989.

4.  "NEIE does not have a current, valid Online Representation and Certification [Application][5] ("ORCA") record." AR Tab 123 at 1989.

5.  "The Dun [&] Bradstreet filing for NEIE states that Chris Coleson is the President of NEIE[.]" AR Tab 123 at 1989.

6.  NEIE does not have an entry in the Department of Veterans Affairs Vendor Information Pages database.  AR Tab 123 at 1990.

7.  NEIE Medical Waste Services, LLC, ("NEIE Medical Waste") a "sister company" of NEIE, completed an ORCA filing on June 20, 2011 that listed the deceased Coleson as the certifier. AR Tab 123 at 1990.

On January 23, 2012, the CO forwarded Guardian's protest to the SBA.  AR Tab 127.

---

[4] The CCR is a government-controlled database containing contractor information.  *See* 48 C.F.R. § 52.204-7(a) (Dec. 20, 2012); *see also id.* § 52.204-7(a) (2013) (changing the name of the CCR to the "System for Award Management").  Contractors are "responsible for the accuracy and completeness of the data."  *Id.* § 52.204-13(b) (2013).

[5] Government contractors are required to file "annual representations and certifications" in the ORCA database.  *See* 48 C.F.R. § 4.1201 (2012); *see also id.* § 4.1201 (2013) (incorporating ORCA into the "System for Award Management").

On February 6, 2012, NEIE responded to Guardian's protest. AR Tab 149A at 2192.3–2192.16. NEIE explained that, although James Coleson died on June 10, 2011, "NEIE remain[ed] eligible for award because the date for the determination of an entity's eligibility as an [SDVOSB] is the date of the submission of proposals." AR Tab 149A at 2192.3–2192.4. NEIE also responded that Guardian's allegations concerning various database updates were "the result of [regulatory] changes [that occurred after] the death of James Coleson . . . [and because] his Will [was] currently in probate . . . . ownership of NEIE . . . ha[d] not been finally resolved." AR Tab 149A at 2192.4; *see also* AR Tab 149A at 2192.11 (stating that inclusion in the VA's vendor database was not a Solicitation requirement, and that the EPA relied on "self-certification pursuant to FAR 52.219-1."[6]); AR Tab 149A at 2192.11 (explaining that "[p]rior to Probate of [James Coleson's] Will and resolution of ownership issues, NEIE cannot update NEIE's ownership information."); AR Tab 149A at 2192.11 ("[NEIE's CCR listing was updated to identify Chris Coleson as the primary contact due to the death of his father. Updating CCR was a necessity because registration is removed if not updated."). In addition, NEIE stated that it had no control over the DUN & BRADSTREET information, which is an independently researched and managed informational database. AR Tab 149A at 2192.11.

On April 30, 2012, the SBA concluded that, because NEIE qualified as an SDVOSB under the Solicitation at the time of NEIE's offer, NEIE was eligible for the award. AR Tab 138 at 2126.[7]

On May 2, 2012, NEIE again asked the CO about the "next steps in the award process." AR Tab 139. In response, the CO advised NEIE that the CO needed to consider "other allegations regarding NEIE's responsibility in Guardian's protest of January 19, 2012 . . . prior to making an award." AR Tab 141 at 2140. A series of emails from NEIE to the EPA followed. AR Tab 140 at 2131–32 (5/3/12 email from Chris Coleson asking the CO why NEIE was not afforded an opportunity to respond to "other allegations"); AR Tab 144 at 2151 (5/4/12 email from NEIE to the CO) (reiterating that "the SBA . . . address[ed] all of Guardian's allegations/protest items in . . . the final determination").

On May 10, 2012, the SBA sent an email to NEIE and the EPA clarifying that the SBA's SDVOSB status determination did not consider responsibility matters, specifically NEIE's use of

---

[6] FAR 52.219-1 provides:

[A]ny person who misrepresents a firm's status as a business concern that is . . . service-disabled veteran-owned small . . . shall—
    (i)     Be punished by imposition of fine, imprisonment, or both;
    (ii)    Be subject to administrative remedies, including suspension and debarment[.]

48 C.F.R. § 52.219-1(d)(2).

[7] 13 C.F.R. § 125.15(e)(1) provides: qualification for SDVOSB status is determined at the time of an initial offer.

James Coleson's name in filings after his death.  AR Tab 148 at 2188 (email from SBA Procurement Analyst to the CO).

On May 11, 2012, NEIE asked if the CO "received the information that NEIE provided to SBA . . . as part of our response to the Guardian protest" and offered to forward that information, if necessary.  AR Tab 149 (5/11/12 email from Chris Coleson to the CO).  NEIE then forwarded NEIE's February 6, 2012 response to Guardian's SBA protest to the CO, explaining that NEIE's failure to update various databases "[was] the result of changes taking place since the death of James Coleson and the fact that his Will [was] currently in probate."  AR Tab 149A at 2192.1 (5/14/12 email from Chris Coleson to the CO).  Therein, NEIE included a March 14, 2012 email, regarding a different solicitation, also explaining that NEIE Medical Waste was a distinct, independent company from NEIE.  AR Tab 149A at 2192.17.  In addition, NEIE included a February 22, 2012 email to the United States Navy regarding a different matter, stating that NEIE was no longer a SDVOSB, but was a small business.  AR Tab 149A at 2192.19.

On May 21, 2012, Guardian filed an agency-level protest with the CO alleging that "NEIE is not an affirmatively responsible small business contractor."  AR Tab 152.1 at 2227.  Guardian's protest reiterated, almost verbatim, the prior SBA protest.  *Compare* AR Tab 123 at 1988–90 (describing how NEIE had failed to update various databases to reflect the death of James Coleson), *with* AR Tab 152.1 at 2227–29 (same).  Guardian's new protest, however, added two factual allegations.  First, NEIE "laid-off many of its employees earlier this year."  AR Tab 152.1 at 2229.  Second, Guardian attached a local magazine article.[8]  AR Tab 152.2 at 2330.  Guardian cited this article as evidence that NEIE no longer had the personnel to perform the contract (AR Tab 152.1 at 2230), and "does not have a satisfactory record of integrity or business ethics to qualify as a responsible contractor."  AR Tab 152.1 at 2231.

On May 23, 2012, NEIE notified the CO that it was "in the process . . . of again updating NEIE, Inc.'s CCR and ORCA."  AR Tab 153.

### D.    The Contracting Officer Issued A Determination Of Non-Responsibility.

On May 25, 2012, the CO issued a Determination of Non-Responsibility and Referral to the [SBA] for a Certificate of Competency ("Determination of Non-Responsibility"), because of "serious concerns regarding the integrity and business ethics of NEIE, Inc."  AR Tab 154 at 2347, 2348–65; AR Tabs 154.1–154.12 (exhibits to the Determination of Non-Responsibility).  In making this determination, the CO primarily relied on the following allegations originally raised in the prior Guardian protests.

1.    James Coleson died on June 10, 2011.  AR Tab 154 at 2354.

---

[8]  The focus of the article explored how Chris Coleson's extreme dieting and weight fluctuations related to his father's death.  AR Tab 159 at 2625–26.  In the article, Chris Coleson also stated that he was forced to layoff longtime employees while waiting for an EPA contract renewal, remarking: "Look, my last-ditch effort with you guys here is just to let you know that I'm not going to eat until you award this contract.  I'm not going to eat until my employees can eat."  AR Tab 159 at 2626.

2. NEIE failed to advise the CO of the death of James Coleson in email correspondence from July 22, 2011 through January 19, 2012 and in the September 29, 2011 Final Proposal Revision.  AR Tab 154 at 2354–55.

3. NEIE continued to use James Coleson's email address in the "cc" field after his death.  AR Tab 154 at 2355.

4. When NEIE updated the CCR and SBA profiles after James Coleson's death, NEIE did not change the identification of James Coleson as the President of NEIE.  AR Tab 154 at 2355.  NEIE Medical Waste ("owned by James Coleson"), however, updated its CCR entry on February 16, 2012.  Because NEIE Medical Waste did update its CCR entry, the CO discounted Chris Coleson's explanation that the information could not be updated prior to resolution of his father's will. AR Tab 154 at 2355 ("If NEIE, Inc's CCR record could not be changed because James Coleson's will is in probate, it would stand to reason that NEIE Medical Waste Services, LLC's CCR record could not be changed either.").  In addition, the January 19, 2012 DUN & BRADSTREET report no longer listed James Coleson as part of NEIE.  AR Tab 154 at 2355.   AR Tab 154 at 2355.  Patricia Sumner, an employee of NEIE, stated in a May 3, 2012 phone conversation that "'someone' told them to leave the certifications as is for NEIE, Inc. because of two ongoing procurements, including the [Solicitation]."  AR Tab 154 at 2355.

5. "It appears that NEIE even attempted to 'transfer' ownership of NEIE to a different veteran when Christopher Coleson indicated in a July 6, 2011 email to the Contracting Officer that Jeremy Feldbusch[9] was an owner at NEIE."  AR Tab 154 at 2355.

6. "Christopher Coleson . . . intentionally and knowingly falsified a certification in ORCA for NEIE Medical Waste Services, LLC when he updated the certifications on June 20, 2011," because the certifications were submitted in the name of James A. Coleson, who is deceased.  AR Tab 154 at 2355.

In addition, the CO advised the SBA that "[i]n order to secure the possibility of a lucrative Government contract set-aside for a service-disabled veteran-owned small business, NEIE, Inc. knowingly and intentionally misled the Government by failing to advise EPA . . . that James Coleson had died."  AR Tab 154 at 2356.

On May 29, 2012, Chris Coleson again asked the CO about the status of the SDVOSB Contract.  AR Tab 155 at 2590.  The CO responded that "NEIE will be notified when there is a change to this status."  AR Tab 155 at 2589.  On May 31, 2012, the CO forwarded a copy of the May 25, 2012 Determination of Non-Responsibility to the SBA, recommending that the SBA "decline to issue a [Certificate of Competency] to NEIE."  AR Tab 156 at 2592.  The CO also stated that this information was provided to the EPA's Office of the Inspector General and the

---

[9] Mr. Feldbusch is a blind veteran and spokesperson for the Wounded Warrior Project, a nonprofit group to aid injured veterans.  AR Tab 159 at 2626.

EPA's Suspension and Debarment Division ("SDD").  AR Tab 156 at 2592.  On June 4, 2012, the CO advised the SBA that "[t]he prospective contractor [NEIE] is non-responsible *only* for the reasons referred."  AR Tab 157 at 2602 (emphasis added); *see also* AR Tab 157 at 2602 ("No impediment to award exists *other* than the decision on responsibility matters." (emphasis added)).

On June 5, 2012, the CO sent an email to the SDD's counsel, together with copy of the Determination of Non-Responsibility and magazine profile of Chris Coleson, referenced as an exhibit to Guardian's protest, with the comment: "I'll allow you to draw your own conclusions." AR Tab 159 at 2615.

On June 7, 2012, the SBA informed Chris Coleson for the first time about the Determination of Non-Responsibility.  AR Tab 191 at 2854; Am. Compl. ¶¶ 34–36.

On June 12, 2012, NEIE sent an email to a local radio reporter complaining about unfair treatment by the EPA with regard to the SDVOSB Contract.  AR Tab 161 at 2631–33.  Therein, NEIE described that NEIE Medical Waste was an independent company, the database entries at issue either were automatic or controlled by third parties, and it was common knowledge at EPA that James Coleson died.  AR Tab 161 at 2632.  The reporter then forwarded NEIE's June 12, 2012 email to the EPA requesting a response.  AR Tab 161 at 2631.  On June 13, 2012, the CO forwarded NEIE's June 12, 2012 email to the SDD's counsel, asking: "Can we use this to reenforce our case?"  AR Tab 161 at 2631.

On June 19, 2012, NEIE applied for a Certificate of Competency ("COC") from the SBA.[10]  AR Tab 191 at 2863–74.

NEIE's June 19, 2012 application stated that:

1.  "[James Coleson's] June 2011 death had no bearing on the completed evaluations [of NEIE's proposal]" nor did it impact "NEIE's ability to perform the contract." AR Tab 191 at 2867.

2.  "Following James Coleson's death, NEIE kept his e-mail account active in order to maintain a complete record of all EPA correspondence. . . . Neither business ethics nor common sense required NEIE to delete his e-mail account after his death. . . . NEIE's decision to 'cc' James Coleson . . . is standard practice . . . , and was not in any way designed to deceive the Contracting Officer."  AR Tab 191 at 2867.

---

[10] FAR 19.602-2(a) allows a small business to apply for a COC from the SBA after a contracting officer issues a non-responsibility determination.  *See* 48 U.S.C. § 19.602-2(a).  If the SBA then issues a COC to the applicant, the contracting officer must award the contract to the applicant.  *See id.* § 19.602-4(b).  The contracting officer, however, may reverse the non-responsibility determination and award the contract to the applicant upon receipt of new information concerning the applicant's responsibility.  *See id.* § 19.602-4(a).

3. The 2011 requested proposal revision inquired about NEIE's technical and financial ability to perform the contract and "NEIE was not required to disclose information [such as James Coleson's death] that was neither requested nor pertinent to the subject procurement." AR Tab 191 at 2868.

4. The death of James Coleson was common knowledge and Chris Coleson "did reach out to numerous persons in EPA Region 2 who had a relationship with his father to inform them of his death." AR Tab 191 at 2869.

5. NEIE Medical Waste is a separate corporate entity from NEIE with different ownership and management.  AR Tab 191 at 2871; *see also* AR 191 at 2871 ("Chris Coleson is not an owner of NEIE Medical Waste Services, LLC[.]").

6. NEIE listed James Coleson as the "alternate" point of contact in the January 12, 2012 CCR profile "to ensure that any contracting officers, businesses or individuals that attempted to contact James Coleson (but were unaware of his death) [w]ould reach Chris Coleson instead." AR Tab 191 at 2872.

7. NEIE did not otherwise update the SBA database or change the CCR database. AR Tab 191 at 2872.

8. The January 19, 2012 DUN & BRADSTREET report, regarding NEIE's ownership, was inaccurate and "NEIE is not responsible for DUN & BRADSTREET's incorrect reporting" because that firm operates an independent, third-party database.  AR Tab 191 at 2872–73.

**E.     The Contracting Officer Initiated A Proposed Debarment.**

On June 25, 2012, SDD's counsel sent an email to the CO, attaching a July 25, 2012 Action Referral Memorandum recommending the debarment of NEIE.  AR Tab 165.[11]  In a footnote, the CO acknowledged receiving "unsubstantiated information through an off-hand remark from one of NEIE's competitors, prior to the pre-award notice being issued in January, 2012, that Mr. James Coleson had died." AR Tab 165 at 2645 n.2.  On June 29, 2012, the CO advised SBA's counsel that the CO needed to "clarify a few paragraphs" of the Determination of Non-Responsibility.  AR Tab 166 at 2713.

On July 5, 2012, the CO requested, via email, that the SBA "withhold the decision on [NEIE's] Certificate of Competency until [the SBA] is in receipt of the [CO's] revised Determination." AR Tab 166 at 2713.

On July 13, 2012, the CO advised the SBA that the proposed revised Determination of Non-Responsibility "is still under review within the EPA," but would be completed in the next

---

[11] It appears that the SDD's counsel provided the CO with an advance copy of the Action Referral Memorandum, but held it for some reason for another month.

week.  AR Tab 167 at 2715.  The CO made only two revisions to the Determination of Non-Responsibility:

>   1.  The sentence, "It was from Guardian's protest that EPA learned that James Coleson had in fact died on June 10, 2011" was moved one paragraph down, from Part I.C.1 on page 4 to Part I.C.2 on page 4.  *Compare* AR Tab 154 at 2351 (original), *with* AR Tab 171 at 2753 (revised).

>   2.  The sentence "Christopher Coleson, through his own admission, intentionally and knowingly falsified a certification in ORCA for NEIE Medical Waste Services, LLC . . . ." was changed to read: "Christopher Coleson, through his role of executor of James A. Coleson's estate and a company officer and authorized representative of NEIE Medical Waste Services, Inc., intentionally and knowingly falsified a certification in ORCA for NEIE Medical Waste Services, LLC . . . ." *Compare* AR Tab 154 at 2355 (original), *with* AR Tab 171 at 2757 (revised).[12]

On July 24, 2012, the CO signed the revised Determination of Non-Responsibility that made only two revisions to the prior May 25, 2012 Determination.  AR Tab 169 at 2734.  This occurred one day before the post-dated Action Referral Memorandum seeking debarment of NEIE.  AR Tab 165 at 2641.

The CO, however, did not forward the revised July 24, 2012 Determination of Responsibility to the SBA until August 6, 2012, citing an "oversight."  AR Tab 170 at 2735.

## F.   The Effect Of The Proposed Debarment On Plaintiff's Effort To Obtain A Certificate Of Competency.

On August 2, 2012, EPA issued Notices of Proposed Debarment to NEIE, Chris Coleson, and NEIE Medical Waste.  AR Tab 184.

The Administrative Record, however, evidences that neither company received the notices of debarment and provides no document explaining why these notices were sent to the wrong address.[13]  AR Tab 175 at 2772 (email from Dean Hohman, NEIE Medical Waste to Chris Coleson asking why EPA listed NEIE Medical Waste Services on an Excluded Parties List and

---

[12] The CO's revisions were so minor that the SBA requested clarification.  AR Tab 171 at 2746.  The CO responded:

>   I highlighted the two places w[h]ere language was clarified.  Page 4 moved [the] reference to Guardian informing the EPA of James Coleson's death to the second paragraph.  Page 8 added the highlighted wording.

AR Tab 171 at 2746.

[13] The EPA sent NEIE and Chris Coleson a Notice of Proposed Debarment to an address in Massachusetts, instead of one of the Virginia addresses listed in NEIE's CCR and SBA profiles.  *Compare* AR Tab 184 at 2801, *with* AR Tab 152.2 at 2237, 2242.

whether Chris Coleson was "misrepresenting [him]self as an owner of NEIE MWS]); AR Tab 175 at 2771 (email to the CO from Chris Coleson suggesting that the EPA likely placed them on the Excluded Parties List, without clarifying that NEIE was only proposed to be debared). The EPA, however, forwarded the proposed debarment to NEIE Medical Waste's counsel via email on August 15, 2012, after he inquired why EPA placed that company on the Excluded Parties List ("EPLS"). AR Tab 180.

On August 7, 10, and 14, 2012, NEIE and the CO exchanged a series of emails regarding the status of NEIE's Certificate of Competency, but the CO never mentioned the August 2, 2012 Proposed Debarment. Instead, the CO directed NEIE to the SBA to answer any inquiries. AR Tab 172; AR Tab 174; AR Tab 175. On August 20, 2012, NEIE Medical Waste received a notice of debarment. AR Tab 182 at 2791. And, on August 30, 2012, the CO forwarded the Notice of Proposed Debarment and related documents to the SBA to "take . . . under advisement during the Certificate of Competency determination regarding NEIE, Inc." AR Tab 186.

On September 27, 2012, the SBA requested a copy of the Action Referral Memorandum discussing NEIE's proposed debarment and the contact information about the relevant EPA Debarment Official. Tab 189 at 2823–24. The CO responded on the same day. Tab 189 at 2825–26.

On October 5, 2012, the CO forwarded the SBA a July 3, 2012 email from Chris Coleson in which he requested that the EPA Administrator review the solicitation process and the "false" allegations raised by the CO against NEIE. AR Tab 192 at 2875, 2877.

On October 9, 2012, the SBA denied NEIE's request for a COC and sent a two-line form letter to the CO, stating that, "[b]ased on a comprehensive analysis of all information, the SBA declines to issue a Certificate of Competency." AR Tab 194. The SBA also sent a letter to Chris Coleson the same day, stating that "information supplied by NEIE was insufficient to refute the Contracting Officer's/agency areas of concern relating to lack of integrity and ethics." AR Tab 199 at 2990.[14]

Nevertheless, on October 16, 2012, the CO asked the SBA for clarification of the "basis for the denial" of the Certificate of Competency. AR Tab 195 at 2969. On October 22, 2012, Congressman Bill Keating's office also asked the SBA about the basis for the denial and requested that EPA place all activity regarding the Solicitation on hold pending resolution of questions concerning the SBA's denial of NEIE's request for a COC. AR Tab 196 at 2972; AR Tab 199 at 2978–79.

On October 19, 2012, the CO determined that, because the SBA denied NEIE a COC, "NEIE, Inc. [was] no longer eligible to receive an award under [the Solicitation]." AR Tab 197 at 2975. The Administrative Record, however, shows that the CO did not wait for a clarification

---

[14] The Government contends that the CO did not see the SBA's second October 9, 2012 denial letter until October 22, 2012, when it became part of another congressional inquiry. Gov't Resp. Suppl. AR 3 n.3; *see also* AR Tab 199 at 2978.

from the SBA, but instead *sua sponte* requested that LATA-Kemron extend its proposal for ninety days.  AR Tab 198 at 2977; *see also* AR Tab 202 at 3000.

On October 25, 2012, the CO forwarded emails between the EPA, Congressman's Keating's office and the SDD regarding the SBA's denial of NEIE's Certificate of Competency to the SBA Counsel.  AR Tab 206 at 3010 (email from the CO to SBA Counsel); AR Tab 207 at 3013 (email from the CO to SBA Counsel).  On that date, the SBA also advised NEIE of the proposed debarment and decision to "find that NEIE is ineligible for COC assistance without reaching the merits of the case."  AR Tab 208 at 3019.  Thereafter, the CO forwarded the SBA's conclusion to the SDD.  AR Tab 209 at 3021.

On November 9, 2012, the EPA stated that "the subject procurement was conducted in strict accordance with all applicable Federal procurement laws and regulations" and that review uncovered no "evidence of bias or unfair treatment directed toward [Chris Coleson] or NEIE."  AR Tab 211 at 3032.

On November 15, 2012, the SDD convened a "presentation of matters in opposition."  AR Tab 223 at 3113.  On November 19, 2012, the CO sent letters to Guardian and LATA-Kemron, the other two offerors that submitted proposals for the SDVOSB Contract, notifying them of concerns regarding pricing and requesting final proposal revisions. AR Tab 215 (Guardian); AR Tab 216 (LATA-Kemron).[15]   In response, Guardian and LATA-Kemron submitted timely final proposal revisions.  AR Tab 217 at 3072-84; AR Tab 218 at 3085-93.

### G.     The Agency's Decision To Terminate Plaintiff's Proposed Debarment But Not To Award The Service-Disabled Veteran-Owned Small Business Contract.

On January 4, 2013, the EPA decided not to award the SDVOSB Contract, because of the CO's determination that neither of the remaining eligible proposals (that of Guardian and LATA-Kemron) was acceptable.  AR Tab 220.

On January 9, 2013, the SDD made the following determinations:

1.  NEIE knew that James Coleson's death would not affect NEIE's eligibility for the Solicitation.  AR Tab 223 at 3115.

2.  NEIE continued to use James Coleson's email account for recordkeeping purposes and all NEIE employees who had access to EPA correspondence "cc'd" to the account.  AR Tab 223 at 3115.

3.  Chris Coleson listed James Coleson in various registration and reporting databases "to alleviate confusion for those individuals attempting to reach James Coleson."  AR Tab 223 at 3115.

---

[15]  According to the CO, NEIE was ineligible for the award because it "was denied a Certificate of Competency by the SBA."  AR Tab 220 at 3104.

As a result, the SDD recommended terminating NEIE's Notice of Proposed Debarment, because the "SDD is without information that contradicts . . . explanations provided by Respondents for their actions related to the EPA procurement."  AR Tab 223 at 3115.

On January 15, 2013, NEIE contacted the CO to ascertain the next step in the award process.  AR Tab 227 at 3126–27.  The CO responded by notifying NEIE of the EPA's January 4, 2013 decision not to award the SDVOSB Contract.  AR Tab 228 at 3132; *see also id.* ("On October 19, 2012, the U.S. Environmental Protection Agency informed you that NEIE, Inc. is no longer eligible to receive an award under [the Solicitation].  The facts of that letter remain unchanged.").

On January 31, 2013, the EPA terminated the proposed debarment of NEIE and Chris Coleson.  AR Tab 232 at 3155.

On February 4, 2013, NEIE sent a demand letter to the CO to award NEIE the SDVOSB Contract by February 11, 2013.  AR Tab 233 at 3158–59.  On February 12, 2013, the CO responded that NEIE was no longer eligible for award and, in any event, the EPA decided not to proceed with any award of the SDVOSB Contract.  AR Tab 237 at 3175.

## II.   PROCEDURAL HISTORY.

On March 5, 2013, NEIE filed a pre-award bid protest Complaint in the United States Court of Federal Claims, together with a Motion For Preliminary Injunction.  On that date, the court convened a telephone conference to discuss the jurisdictional issues raised in the March 5, 2013 Complaint and establish a briefing schedule.

On March 7, 2013, the Government filed an Unopposed Motion For A Protective Order that the court granted on the same day.

On March 19, 2013, the Government filed the Administrative Record, under seal (AR 1–3209).

On April 29, 2013, the Government filed a Consent Motion Seeking Leave To Correct And Amend The Administrative Record to include an inadvertently omitted e-mail and attachment that NEIE sent the CO on May 14, 2012.  On April 30, 2013, the court granted the Government's Motion.  In addition, on that date, the Government filed a Supplement To The Administrative Record, under seal (AR Tab 149A at 2192.1–2192.21).

On May 14, 2013, NEIE also filed a Motion To Supplement The Administrative Record, to include the following three documents, because the SDD considered them during the proposed debarment of NEIE:

1.  NEIE's October 29, 2012 Response To The Proposed Debarment Of NEIE And Christopher Coleson.

2.  NEIE's December 14, 2012 Supplemental Response To The Proposed Debarment Of NEIE And Christopher Coleson.

    3.  The transcript of the November 15, 2012 Presentation Of Matters In Opposition Hearing.

Mot. Suppl. AR 1.

On May 14, 2013, NEIE also filed a Motion For Leave To File [An] Amended Complaint, alleging violations of FAR 1.602-2(b),[16] 3.101-1,[17] and 15.305.[18]  On May 15, 2013, the Government filed a Response.  On May 22, 2013, NEIE filed a Reply.

On May 17, 2013, NEIE filed a Motion For Judgment On The Administrative Record ("Pl. Mot. JAR").  On June 28, 2013, the Government filed a Cross-Motion For Judgment Upon The Administrative Record And Response ("Gov't Resp.").  On July 19, 2013, NEIE filed a Response and Reply ("Pl. Resp. JAR").  On August 9, 2013, the Government filed a Reply. ("Gov't Reply").

On May 31, 2013, the Government filed a Response In Opposition To Plaintiff's Motion To Supplement The Administrative Record, together with a Declaration of the EPA's Placement CO in support.  On June 10, 2013, NEIE filed a Reply.  Because the court does not rely on these three documents in reaching a decision in this case, the court need not rule on NEIE's May 14, 2013 Motion To Supplement The Administrative Record.[19]

---

[16] FAR 1.602-2(b) requires the CO to "[e]nsure that contractors receive impartial, fair, and equitable treatment."  48 C.F.R. § 1.602-2(b).

[17] FAR 3.101-1 imposes standards of conduct on transactions between agencies and contractors:

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

48 C.F.R. § 3.101-1.

[18] FAR 13.305 provides standards for how agencies must evaluate competitive proposals. *See, e.g.*, 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). But, FAR 15.305(b) allows the "source selection authority" to "reject all proposals received in response to a solicitation, if doing so is in the best interest of the Government."  *Id.* § 15.305(b).

[19] These documents reiterate factual assertions and responses that NEIE previously made in the course of the bid proceedings and as such, are already in the Administrative Record.

On June 7, 2013, the court issued a Memorandum Opinion And Order granting NEIE's May 14, 2013 Motion For Leave To File [An] Amended Complaint.  On June 10, 2013, NEIE filed an Amended Complaint that alleges:

1.  The EPA's nonresponsibility determinations against NEIE, proposed debarment, and decision not to make award under the SDVOSB Contract portion of the Solicitation were the result of bad faith and bias against NEIE, and were not based upon an open, fair and impartial review or assessment of the facts or the EPA's needs, in violation of FAR 1.102 and 1.102-2(c).  Am. Compl. ¶¶ 64–69 (Count I)).

2.  The EPA's nonresponsibility determination, proposed debarment of NEIE, and other actions constituted an unlawful de facto debarment of NEIE.  Am. Compl. ¶¶ 71–73 (Count II)).

3.  The EPA violated FAR 19.1405(c) by deciding not to make an award under the SDVOSB Contract to the Solicitation, because it received at least one acceptable offer from NEIE, an SDVOSB.  Am. Compl. ¶¶ 75–80 (Count III)).

4.  The EPA's actions violated provisions of the Solicitation prohibiting any one offeror from receiving more than one award and only requiring SDVOSB concerns to submit one proposal in order to be considered.  Am. Compl. ¶¶ 82–86 (Count IV)).

5.  The EPA's actions constituted a breach of the implied-in-fact covenant of good faith and fair dealing, were arbitrary and capricious, and were motivated by bad faith.  Am. Compl. ¶¶ 88–89 (Count V); *id.* ¶¶ 91–97 (Count VI)).

6.  The EPA's decision to not make an award under the SVOSB set-aside, nonresponsibility determinations, and interference with the COC process violated FAR 1.602-2(b), 3.101-1, and 15.305.  Am. Compl. ¶¶ 99–101 (Count VII); *id.* ¶¶ 103–05 (Count VIII); *id.* ¶¶ 107–11 (Count IX).

The June 10, 2013 Amended Complaint requests declaratory relief as to each of these counts, a permanent injunction directing the EPA to reinstate the SDVOSB Contract portion of the Solicitation, reopen the award process, and award NEIE damages and equitable relief for the

---

*Compare, e.g.*, AR 149A at 2192.10–2192.11 (explaining that inaccuracies in government database filings related to the death of James Coleson), *with* Pl. Mot. Suppl. Ex. A at 12–13 (explaining the difficulties in handling updates of government databases after the death of James Coleson); AR Tab 161 at 2632 (describing ways in which Chris Coleson publicized the death of his father), *with* Pl. Mot. Suppl. Ex. A at 14 (describing how NEIE publicized the death of James Coleson).  *But see, e.g.*, Pl. Mot. Suppl. Ex. A at 5–7 (arguing that a debarment of NEIE, given the facts of this case, would be "unprecedented").  The court notes, however, that in January 7, 2013 correspondence, the EPA debarment officer explained to the CO that the allegations against NEIE were not substantiated and debarment would not be pursued, citing the three documents that are at issue.  AR Tab 223 at 3113–16.

EPA's breaches of the duty of good faith, fair dealing, and honest consideration, including proposal costs, and related attorneys' fees and costs. Am. Compl. at 18–19.

On June 10, 2013, the Government also filed a Second Consent Motion Seeking Leave To Correct And Amend The Administrative Record to include an inadvertently omitted copy of the GAO's March 11, 2011 Decision denying NEIE's initial bid protest (AR Tab 46A at 1685.1–1685.3).  On that date, the court granted the Government's Motion, and on June 11, 2013, the Government filed a Second Amended Administrative Record, under seal.

## III.    DISCUSSION.

### A.    Jurisdiction.

The United States Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).

Section 1491(b)(1) also authorizes the court "to review cancellations of negotiated procurements to ensure compliance with the requirements of 'integrity, fairness, and openness' in FAR 1.102(b)(3)[20] and the requirement that '[a]ll contractors and prospective contractors shall be treated fairly and impartially' in FAR 1.102-2(c)(3)."[21]   *FFTF Restoration Co. v. United States*, 86 Fed. Cl. 226, 237 (2009); *see also id.* (determining that FAR 1.102 imposes mandatory duties, not mere guidelines, on agencies that are reviewable under 28 U.S.C. § 1491(b)(1)).

The United States Court of Federal Claims only has limited jurisdiction over a proposed debarment, only exercising jurisdiction insofar as the proposed debarment's direct impact adversely impacts a disappointed bidder's failure to be awarded a specific contract; the court, however, does not have jurisdiction over the underlying merits of any debarment.[22]   *See FAS*

---

[20] FAR 1.102(b)(3) provides that "[t]he Federal Acquisition System will . . . [c]onduct business with integrity, fairness, and openness."  48 C.F.R. § 1.102(b)(3).

[21] FAR 1.102-2(c)(3) provides that

> The Government shall exercise discretion, use sound business judgment, and comply with applicable laws and regulations in dealing with contractors and prospective contractors.  All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.

48 C.F.R. § 1.102-2(c)(3).

[22] Herein, the court has considered only the actions of the CO and the SDD to propose the debarment of NEIE and Chris Coleson.  *Cf. IMCO, Inc. v. United States*, 97 F.3d 1422, 1425

*Support Servs., LLC v. United States*, 93 Fed. Cl. 687, 695–96 (2010) ("[T]he [United States] Court of Federal Claims correctly exercised implied contract jurisdiction to resolve allegations of error in suspension actions affecting specific procurements."); s*ee also Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 557 (1999) ("In order to successfully raise the debarment issue in this Court, Medina must be able to demonstrate that it has been damaged in some way related to the contract.").

In this case, the June 10, 2013 Amended Complaint alleges several violations of law and regulations "in connection with" this procurement. Am. Compl. ¶¶ 64–69, 75–80. The Amended Complaint also alleges that these violations relate to a proposed award and eventual cancellation of a negotiated procurement. Am. Compl. ¶¶ 107–11. According to the Amended Complaint, the proposed debarment "prevent[ed] NEIE from receiving a COC and being eligible for award under the Solicitation." Am. Compl. ¶ 46. Consequently, the proposed debarment of NEIE was arbitrary and capricious. Am. Compl. ¶ 93. The Amended Complaint further alleges a violation of the covenant of good faith and fair dealing. Am. Compl. ¶¶ 88–89, 91–97.[23]

For these reasons, the court has determined that it has jurisdiction to adjudicate the claims alleged in the June 10, 2013 Amended Complaint, pursuant to 28 U.S.C. § 1491(b)(1). The court also has determined that it has jurisdiction to review the proposed debarment, because the proposed debarment is interrelated to the EPA's October 19, 2012 decision to deny the SDVOSB Contract to NEIE, and may be dispositive of the EPA's January 4, 2013 decision to cancel the procurement at issue.

---

(Fed. Cir. 1996) (clarifying that the jurisdiction of the United States Court of Federal Claims is limited to reviewing the proposal for debarment, not the debarment itself, because a challenge to the debarment itself must be brought in a United States District Court).

[23] In a footnote, the Government's Reply argues that Count V of NEIE's Amended Complaint should be dismissed for failure to state a claim, because it alleges that "[t]he [EPA] . . . breached the implied-in-fact contract of good faith, fair dealing, and honest consideration that the Agency entered into with NEIE when the competition under the Solicitation commenced." Gov't Cross Mot. JAR 3 (quoting Am. Compl. ¶ 88). The Government contends that this covenant is inapplicable in the bid protest context, because the covenant does not arise until a contract is consummated. Gov't Cross Mot. JAR 3 n.3 (citing *Scott Timber Co. v. United States*, 692 F.3d 1365 (Fed. Cir. 2012) (holding that, in a challenge to pre-award conduct by an agency, the covenant does not attach)).

Although NEIE is correct that the jurisdiction of the court in Scott Timber arose under the Contract Disputes Act, instead of the court's bid protest jurisdiction and 28 U.S.C. § 1491(b), the court in this case does not need to rule on whether the covenant of good faith and fair dealing is applicable in a bid protests context, because FAR 1.102-2(c)(3) mandates the fair and impartial treatment of *all* government contractors, including prospective government contractors. Accordingly, the court reads the allegations in the Amended Complaint at ¶¶ 18–29, 71, 97 to allege a violation of FAR 1.102-2(c)(3).

### B.      Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1).  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").  The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with the definition of "interested party," as recited in the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3551(2)(A).  *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)).  As such, the United States Court of Appeals for the Federal Circuit requires that a two-part test be applied in determining whether a protester is an "interested party."  A protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).  In addition, in post-award protests, the plaintiff also must show it had a "substantial chance" of receiving the contract.  *See Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing *Rex Serv.*, 448 F.3d at 1308).  To do so, the plaintiff must affirmatively demonstrate that it is a responsible contractor.  *See Myers Investigative & Sec. Servs.*, 275 F.3d at 1371 ("Awards may not be made to contractors that are not responsible. 48 C.F.R. § 9.103(a) (2001).").

The second standing requirement is that the protestor must show that the alleged errors in the procurement were prejudicial.  *See Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1315–16 (Fed. Cir. 2011) (requiring a bid protestor to show prejudice where the alleged violations do not involve "fundamental procedural rights"); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks omitted); *see also Myers Investigative & Sec. Servs.*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").  Prejudice is demonstrated where the protestor "can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt Food Serv.*, 577 F.3d at 1378; *see also Todd Constr.*, 656 F.3d at 1316 (quoting *Labatt Food Serv.*, 577 F.3d at 1378); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (noting that the "[substantial chance] test is more lenient than showing actual causation").  Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error.  *See Labatt Food Serv.*, 577 F.3d 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

In this case, NEIE submitted a timely proposal for the SDVOSB Contract Solicitation. On January 18, 2012, the EPA designated NEIE as the potential awardee. AR Tabs 120–22.  As such, NEIE had a substantial chance to receive the SDVOSB Contract, but for the CO's subsequent May 25, 2012 Non-Responsibility Determination, the CO's actions related to NEIE's application for a Certificate of Competency, the EPA's proposed debarment of NEIE, and the EPA's eventual decision not to award the SDVOSB Contract.  *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (requiring that a bid protestor establish

that, "but for the alleged error, there was a 'substantial chance that [the protestor] would receive an award—that it was within the zone of active consideration" (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983))). The Amended Complaint alleges that the EPA's decision to deny NEIE the SDVOSB Contract, based on the aforementioned, was unlawful.   Am. Compl. ¶ 71 ("The Agency's nonresponsibility determinations; interference with the COC process; proposed debarment of NEIE, and decision not to make award under [] the SDVOSB set-aside portion of the Solicitation comprised a systematic effort by the Agency to reject NEIE's Proposal.").

For these reasons, the court has determined that NEIE is "an interested party" in that it was an actual bidder and had a "direct economic interest" in this procurement.   *See Distrib. Solutions*, 539 F.3d at 1344.   Accordingly, NEIE has standing to seek an adjudication of the claims alleged in the Amended Complaint.

## C.    Applicable Standards Of Review.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.   *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citations omitted)); *see also Weeks Marine*, *Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (same).

If an award decision is challenged because it was made without a rational basis, the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."   *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001); *see also Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) ("We must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal alterations, quotations and citations omitted); *Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement decisions invoke[] highly deferential rational basis review . . . [u]nder that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotations and citations omitted).   "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"   *Ala. Aircraft Indus. Inc.-*

*Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In addition, "a protester must identify 'hard facts;' a mere inference or suspicion . . . is not enough." *PAI Corp. v. United States,* 614 F.3d 1347, 1352 (Fed. Cir. 2010). In other words, the trial court must cite specific parts of the Administrative Record before determining that the agency decision is arbitrary and capricious, and may not rely on mere "suspicion and innuendo." *CACI,* 719 F.2d at 1582. The disappointed bidder also must demonstrate the arbitrary and capricious nature of an agency decision by a preponderance of the evidence. *See Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 79 (2013) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995–96 (Fed. Cir. 1996)).

Nevertheless, an agency also must treat each offeror equally, applying a consistent standard for evaluating each proposal. *See PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004), *aff'd* 389 F.3d 1219 (Fed. Cir. 2004) ("[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion.").

> **D.    Whether The Contracting Officer's Determination Of Non-Responsibility Was Unlawful.**
>
> **1.    The Plaintiff's Argument.**

An agency's determination of non-responsibility based on "integrity and business ethics" should be "determined solely with reference to whether a contractor is law abiding; it is not a purely subjective standard." Pl. Resp. JAR 9 (citing FAR 9.104-1(d));[24] *see also* Pl. Resp. JAR 10 (citing *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994) ("The law of procurement does not tolerate actions reflecting personal predilections of administrative officials, whether ascribable to whim, misplaced zeal, or impermissible influence.").

In this case, the CO premised the Determination of Non-Responsibility "entirely on the breach of a heightened duty to disclose *immaterial* facts—a duty that simply does not exist." Pl. Mot. JAR 22 (emphasis in original). James Coleson's death was immaterial, because his position as "Responsible Corporate Officer" was neither a "key personnel position" nor "an evaluation factor for award." Pl. Mot. JAR 25; *see also* Pl. Mot. JAR 23 (citing *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 471, 483 (2012) (defining a material misrepresentation as one in which "the [agency] relied on [the misrepresentation] in selecting [the awardee's] proposal for the contract award")). In addition, "none of the alleged '[mis]representations' involved information that was material to the agency's evaluation of NEIE's proposal." Pl. Resp. JAR 6. Absent specific language in the Solicitation, "the [United

---

[24] FAR 9.104-1(d) provides that a "prospective contractor must . . . [h]ave a satisfactory record of integrity and business ethics (for example, see Subpart 42.15)." 48 C.F.R. § 9.104-1(d). FAR 42.1501, in turn, explains that "[p]ast performance information . . . is relevant information, for future source selection purposes," including records concerning the contractor's "[i]ntegrity and business ethics." 48 C.F.R. § 42.1501(a) and (a)(6).

States] Court of Federal Claims . . . repeatedly [has] rejected the notion that contractors have a duty to disclose immaterial changes in their proposal between their initial offer and award." Pl. Mot. JAR 23 (citing *OAO Corp. v. United States*, 49 Fed. Cl. 478, 482 (2001) (finding no duty to update a proposal between final offer and award, as the Solicitation had no such requirement); *see also* Pl. Mot. JAR 24 (citing *Phoenix Mgmt., Inc. v. United States*, 107 Fed. Cl. 58, 68–70 (2012) (rejecting a bid protest, because absent a contrary requirement in the Solicitation, relying on proposed staff without a commitment to work did not amount to a material misrepresentation)).

The CO erroneously found that NEIE's copying of James Coleson's name on email correspondence after his death and the listing of his name in the CCR were misrepresentations. Pl. Resp. JAR 7 (quoting *Reema Consulting Servs., Inc. v. United States*, 107 Fed. Cl. 519, 531–32 (2012) ("There is no indication that the [CCR] system . . . [was] to be used in examining proposals."). And, the CO's cited "misrepresentations" were "solely attributable to entities and individuals entirely unrelated to NEIE—namely, NEIE Medical Waste [Services], LLC . . . and the DUN & BRADSTREET database, over which NEIE ha[d] no control." Pl. Resp. JAR 7–8.

Based on these incidents, the CO "rushed to judgment" without allowing NEIE to respond to the allegations of unethical conduct. Pl. Mot. JAR 26–27 (citing *Afghan Am. Army Servs. Corp. v. United States*, 106 Fed. Cl. 714, 726 (2012) (finding a CO's non-responsibility determination to be arbitrary and capricious, because the officer "rush[ed] to judgment without obtaining a more complete picture" or allowing the contractor to provide a "fuller picture" of the situation)). Moreover, the CO failed to notify NEIE of any the allegations against it, nor afford it a response. Pl. Mot. JAR 27–28 (citing *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 968 (D.C. Cir. 1980) ("[D]ue process . . . includes the right to be notified of the specific charges concerning the contractor's alleged lack of integrity, so as to afford the contractor an opportunity to respond to and attempt to persuade the contracting officer, in whatever time is available, that the allegations are without merit.")).

NEIE also points to evidence in the Administrative Record, ignored by the CO making the Determination of Non-Responsibility, "that tended to negate any inference that NEIE had attempted to conceal James Coleson's death." Pl. Mot. JAR 30. For example, the CO failed to mention NEIE's response to Guardians' SDVOSB protest. Pl. Mot. JAR 31. This evidences that the CO failed to "examine the relevant data and articulate a satisfactory explanation for [the] action." Pl. Mot. JAR 30 (citing *State Farm*, 463 U.S. at 43 ("[A]n agency rule would be arbitrary and capricious if the agency . . . has offered an explanation for its decision that runs counter to the evidence before the agency[.]")); *see also id.* at 30–31 (citing *360Training.com, Inc. v. United States*, 106 Fed. Cl. 177, 196 (2012) ("The Court can conclude only that [the agency's] decision runs counter to the evidence in the record, and if [the agency] had a reason for rejecting that contrary evidence, [the agency] has not provided any explanation of its decision."); *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 742 (2000) ("[T]he arbitrary and capricious standard . . . . does not require this court to accept, in a Kierkegaardian leap of faith, bald assertions on a critical point that are not otherwise tied to the administrative record and that are at least in tension with, if not contradicted by, various aspects of that record.")).

Nor are "suspicions and allegations" sufficient to support a determination of non-responsibility. Pl. Resp. JAR 10 (quoting *Action Serv. Corp. v. Garrett*, 790 F. Supp. 1188, 1197

(D.P.R. 1992)).   In particular, allegations made by a direct competitor citing internet sources should be subject to a higher level of scrutiny.  Pl. Resp. JAR 12 (citing *United States v. Jackson*, 208 F.3d 633, 637 (7th Cir. 2000) ("[A]ny evidence procured off the Internet is adequate for almost nothing[.]" (quoting *St. Clair v. Johnny's Oyster & Shrimp, Inc.*, 76 F. Supp. 2d 773, 775 (S.D. Tex. 1999))).

The CO also "refused to acknowledge that [in fact] she had heard about James Coleson's death prior to the [EPA's] issuance of the initial notice of intent to award to NEIE," which negates any inference that James Coleson's death was kept secret.  Pl. Mot. JAR 32 (citing AR Tab 165 at 2645, n.2 (Action Referral Memorandum, acknowledging that the CO learned of James Coleson's death from one of NEIE's competitors "prior to the pre-award notice being issued in January, 2012")).   Nevertheless, the CO initially determined that "NEIE meets the responsibility standards set forth in FAR 9.1."  Pl. Mot. JAR 33.

Therefore, the CO's subsequent reversal, *ipso facto*, was arbitrary and capricious.  Pl. Mot. JAR 33–34 (citing *Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 247 (2001) (concluding that an agency's determination that a contractor lacked integrity was arbitrary and capricious where the agency previously awarded the contractor several contracts after learning of the allegedly unethical conduct)).

## 2.        The Government's Response.

The Government responds that the CO properly exercised discretion in making the Determination of Non-Responsibility.  Gov't Cross Mot. JAR 29 (citing cases establishing the "wide discretion" given to responsibility determinations).   Questions concerning "integrity" and "business ethics" are not limited to violations of law.  Gov't Reply 11.  Debarment, for example, can occur for "any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor."  Gov't Reply 11 (quoting FAR § 9.406-2(c)).  Moreover, "NEIE implicitly concedes the accuracy of the allegations by arguing that its misrepresentations are not material[.]"  Gov't Reply 11.

Contrary to the Plaintiff's argument (Pl. Mot. JAR 22), NEIE's failure to disclose the death of James Coleson "was not the sole basis for her nonresponsibility determination."  Gov't Cross Mot. JAR 30 (citing AR Tab 169 at 2726–34).  Instead, the CO's decision was based on information revealed to the EPA as a result of Guardian's SDVOSB status protest that demonstrated NEIE "made concerted efforts to hide [James Coleson's death] from EPA in order to obtain award[.]"  Gov't Cross Mot. JAR 30 (quoting AR Tab 169 at 2732 (alterations in Government's Motion)).   Whether or not NEIE had an affirmative duty to disclose James Coleson's death, the fact is that NEIE "continued to act as if James Coleson were alive [and this] was sufficient justification for the [CO] to question NEIE's integrity and ethics."  Gov't Cross Mot. JAR 32; *see also* Gov't Reply 13 ("Even if NEIE did not intend to conceal James Coleson's death it was clearly less than candid in its dealings with the EPA.").   In addition, failing to remove James Coleson's name from NEIE's proposal "provided a basis to question NEIE's integrity."  Gov't Reply 14.  Likewise, continuing to use James Coleson's email address after his death "begs the question as to whether NEIE was attempting to mislead EPA."  Gov't Reply 14.  And, continuing to list his name in federal databases "established NEIE was dishonest."  Gov't Reply 14.  Therefore, the CO had a "rational basis for concluding that 'NEIE had demonstrated a

serious lack of integrity and business ethics,'" and was "required to refer the matter to SBA for a COC."  Gov't Cross Mot. JAR 31 (quoting AR Tab 169 at 2726).

Contracting officers, consistent with their broad discretion, are not required to give a contractor a chance to respond before making a non-responsibility determination.  Gov't Cross Mot. JAR 29 (citing *John C. Grimberg Co., Inc. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("[T]he contracting officer was not required to seek additional information from [the contractor] prior to making his decision of nonresponsiblity[.]")).  And, the cases Plaintiffs cite are distinguishable.[25]

Likewise, NEIE's argument that the CO did not consider relevant contradictory evidence is unsupported, because the documents NEIE sent to the CO (AR Tab 149A at 2192.1) did not respond to all the allegations in Guardian's protest and do not establish that NEIE was responsible.  Gov't Cross Mot. JAR 35.  Simply because the Determination of Non-Responsibility "did not reference NEIE's response to the CCR registration issue does not mean that the [CO's] nonresponsibility determination was not a product of reasoned decision making."  Gov't Cross Mot. JAR 35.

Finally, NEIE's argument that it did not misrepresent or conceal James Coleson's death, because the CO previously "heard about James Coleson's death prior to the [EPA's] issuance of the initial notice of intent to award to NEIE" (Pl. Mot. JAR 32–34), is irrelevant.  Gov't Cross Mot. JAR 35.  The CO had discretion to revise the prior determination that NEIE was responsible, because of the unrefuted fact that NEIE continued to use James Coleson's name after his death—information the EPA did not have in its possession when the CO made the initial

---

[25] For example, *Afghan American Army Services* involved "unusual circumstances" not present in this case.  Gov't Cross Mot. JAR 33.  Other cases involved situations where the Government's "decision that the contractor lacked integrity effectively barred the contractor" from all government work.  Gov't Cross Mot. JAR 33–34 (citing *NCL Logistics Co. v. United States*, 109 Fed. Cl. 596, 620 (2012) (finding that a contractor's "vendor vetting rating operate[ed] as a *de facto* debarment," because it "effectively deprived [the contractor] of future DoD contract awards in Afghanistan for up to one year")).  Moreover, "[p]rocedural due process rights are only triggered in cases of de facto debarment."  Gov't Reply 16 (citing *Old Dominion Dairy Prods.*, 631 F.2d at 955–56 ("[W]e hold that when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice . . . and some opportunity to respond[.]")).

determination.  Gov't Cross Mot. JAR 35 (citing FAR 19.602-1(a)).[26]  And, "unlike the agency in *Lion Raisins*, EPA was not previously in possession of all the information appended to the Guardian protest."  Gov't Cross Mot. JAR 36.

### 3.   The Court's Resolution.

The court reviews a CO's responsibility determination based on traditional APA standards, and "cannot substitute [its] judgment for that of the contracting officer in making responsibility determinations."  *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 421, 423 (2002) ("[A] responsibility determination by a contracting officer (CO) is not immune from judicial review simply because allegations of fraud or bad faith are absent.   Rather, . . . '[t]he traditional APA standard . . . allows for review of an agency's responsibility determination if there has been a violation of a statute or regulation, or alternatively, if the agency determination lacked a rational basis.'" (quoting *Impresa Construzioni*, 238 F.3d at 1333)).   In reviewing a responsibility determination based on the "integrity and business ethics" requirement, the court "may look to the more extensive debarment regulations for guidance[.]"  *Impresa Construzioni*, 238 F.3d at 1335.

In this case, EPA identified NEIE as the potential awardee on January 18, 2012. Following an unsuccessful protest by Guardian (AR Tab 138 at 2126), EPA would have awarded the SDVOSB Contract to NEIE but for the CO's May 25, 2012 decision to issue a Determination of Non-Responsibility.   AR Tab 154 at 2348–65; AR Tab 157 at 2602 ("No impediment to award [the SDVOSB Contract to NEIE] exists other than the decision on responsibility matters.").

A thorough review of the Administrative Record reveals that, in issuing the May 25, 2012 Determination of Non-Responsibility, the CO ascribed an "implausible" motive for NEIE's actions, failed to consider new evidence that would tend to contradict the CO's concerns about NEIE's integrity, and "offered an explanation for [the] decision that runs counter to the evidence before [the CO]." *Ala. Aircraft Indus.*, 586 F.3d at 1375 (quoting *State Farm*, 463 U.S. at 43).

Although the court is required to uphold an agency decision even if it is "less than ideal clarity," the court will not uphold "implausible" decisions nor "supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm*, 463 U.S. at 43 (quoting *Secs. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).   In the Determination of Non-Responsibility, the CO characterized NEIE's handling of James Coleson's death as a vast

---

[26] FAR 19.602-1(a) provides:

Upon determining and documenting that an apparent successful small business lacks certain elements of responsibility (including, but not limited to, . . . integrity . . . ), the contracting officer shall—

(1) Withhold contract award[.]

48 C.F.R. § 19.602-1(a).

conspiracy to mislead the EPA: "[i]n order to secure the possibility of a lucrative Government contract set-aside for a service-disabled veteran-owned small business, NEIE, Inc. knowingly and intentionally misled the Government by failing to advise EPA . . . that James Coleson had died."  AR Tab 154 at 2356.  This reasoning, however, was deeply flawed.

Nothing in the Administrative Record nor anything cited to by the CO gives credence to the serious charge that NEIE "knowingly and intentionally misled" anyone.  *Cf. Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 573, 581 (2010) (rejecting a GAO decision as arbitrary and capricious where the only "hard fact" supporting an appearance of impropriety was "mere 'suspicion or innuendo.'" (quoting *CACI*, 719 F.2d at 1581–82))); *see also Overstreet Elec.*, 47 Fed. Cl. at 742  ("[T]he arbitrary and capricious standard . . . . does not require this court to accept . . . bald assertions on a critical point that are not otherwise tied to the administrative record and that are at least in tension with, if not contradicted by, various aspects of that record.").  NEIE had no reason to mislead the EPA about the death of James Coleson because, as confirmed by the SBA in resolving the Guardian protest, the FAR only requires that a contractor meet the eligibility requirements for an SDVOSB *at the time of offer*.  AR Tab 223 at 3115 (finding that NEIE knew that James Coleson's death would not affect NEIE's eligibility); AR Tab 138 at 2126 (resolving the Guardian protest); AR Tab 149A at 2192.4 (NEIE's 2/6/12 response to the Guardian protest) ("The allegations raised by . . . Guardian . . . regarding NEIE's ownership ignore well-settled law establishing the date of submission of proposals as the proper date for determining an entity's eligibility as an SDVO SBC."); AR Tab 149 (forwarding NEIE's 2/6/12 response to the CO on 5/11/12).  NEIE unquestionably was controlled by James Coleson, a service-disabled veteran, at the time of its offer.  The CO pointed to no evidence whatsoever suggesting that NEIE made any offers for SDVOSB set asides *after* James Coleson's death and, in fact, the Administrative Record contains evidence to the contrary suggesting that NEIE took proactive steps to ensure compliance with relevant requirements by declining to bid on other SDVOSB set-asides.  AR Tab 149A at 2192.11 ("NEIE has not pursued any Government contracts with this CCR since the date of James Coleson's death."); AR Tab 149A at 2192.15 (NEIE Corporate Meeting Notes) (same); AR Tab 149A at 2192.17 (turning down a solicitation from the United States Air Force in March 2012, because "NEIE, Inc. cannot respond as an SDVO at this time."); AR Tab 149A at 2192.19 (turning down an inquiry from the United States Navy in February 2012, because "right now we are only Small Business" and not veteran-owned).

In addition, the Administrative Record contradicts the CO's assertion that NEIE attempted to keep EPA from learning of James Coleson's death.  AR Tab 165 at 2645 n.2 (stating that the CO learned of James Coleson's death *before* issuing the January 18, 2012 award notice);  AR Tab 159 at 2626 (a local 4/17/12 newspaper article discussing Chris Coleson's reaction to the death of his father); AR Tab 161 at 2632 (6/12/12 email from Chris Coleson to John Aberle, reporter)[27] (reflecting that "it was common knowledge that [James Coleson] had

---

[27] The Government has not argued that NEIE actually attempted to conceal the death of James Coleson, nor has the Government attempted to construe Chris Coleson's June 12, 2012 email as a post-hoc attempt to make it appear as though NEIE did not conceal James Coleson's death.  After considering the entire Administrative Record, the court construes the email as a descriptive summary of well-known (and easily verified) facts concerning the publicity surrounding the death of James Coleson, who was a well-known figure in the local community.

passed away"); AR Tab 161 at 2632 (suggesting that John Aberle interviewed Chris Coleson in July 2011 concerning the death of James Coleson and that John Aberle reached out to the CO and another EPA official for comment); AR Tab 161 at 2632 (stating that "people from USEPA's Region 2 ERRS cleanup contracts attend[ed] [James Coleson's] funeral"); AR Tab 161 at 2632 (asserting that Chris Coleson published an Amazon electronic book that discussed his father's death).

More importantly, NEIE had no legal duty to disclose the death of James Coleson to the EPA, because his death was immaterial to NEIE's performance of the SDVOSB Contract. To be a material misrepresentation, NEIE would have had to make a "false statement" on which the EPA "relied . . . in selecting [NEIE's] proposal for the contract award." *GTA Containers*, 103 Fed. Cl. at 483 (quoting *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006), *aff'd* 492 F.3d 1308 (Fed. Cir. 2007)). First, NEIE's proposal did not identify James Coleson as a key personnel. AR Tab 3 at 280. Second, the EPA did not identify his position as an evaluation factor in the Solicitation. AR Tab 1 at 144–45. Third, EPA did not rely on James Coleson's involvement in performing the work subject to the SDVOSB Contract in initially selecting NEIE's proposal. *See OAO*, 49 Fed. Cl. at 482 (finding no duty to "update the availability of key personnel between final offer and award," where no such requirement exists in the Solicitation); *see also Phoenix Mgmt.*, 107 Fed. Cl. at 70 ("Because no such requirement existed [in the Solicitation], [the contractor] did not make material misrepresentations by including in its proposal credentials of people who had not committed to serve as its staff members."). The Government's attempt to downplay this problem by asserting that NEIE's failure to disclose the death of James Coleson "was not the sole basis for [the CO's] nonresponsibility determination" (Gov't Cross Mot. JAR 30), fails to explain how the CO's determination could be rational, when based on the faulty premise that the EPA relied on whether James Coleson was dead or alive in awarding the SDVOSB Contract to NEIE.

To be sure, the FAR requires that the CO consider new information pertaining to responsibility and, if the information is exculpatory, that new information is grounds for the CO to reverse a nonresponsibility determination and award the contract to the prospective awardee. *See e.g.*, 48 C.F.R. § 19.602-4(a) ("If new information causes the contracting officer to determine that the concern referred to the SBA is actually responsible to perform the contract, and award has not already been made . . . , the contracting officer shall reverse the determination of nonresponsibility, notify the SBA of this action, withdraw the referral, and proceed to award the contract."); *id.* § 19.602-3(c)(3) ("Denial of a COC by the SBA does not preclude a contracting officer from awarding a contract to the referred concern[.]"); *see also* Gov't Cross Mot. JAR 25 (conceding that "[t]he contracting officer may, however, choose to make an award to the contractor if the contracting officer determines there is new and material evidence clearly establishing that the contractor is responsible."). In a June 12, 2012 email from a local radio reporter, the CO was advised that NEIE Medical Waste was a separate corporation, provided an explanation of why the database was not updated, and reminded that it was common knowledge at EPA that James Coleson died. AR Tab 161 at 2632. On June 19, 2012, NEIE's application for a COC corroborated the statements in the June 12, 2012 email. AR Tab 191 at 2863–74.[28]

---

[28] The court considers the June 12, 2012 email and NEIE's June 19, 2012 COC application as those two documents relate to the issue of the CO's compliance with FAR section 19.602-4(a). Because these documents were not before the CO when she issued the initial May

Even though the CO subsequently withdrew the May 25, 2012 Determination of Non-Responsibility, the CO never considered this new information. AR Tab 171 (containing the revised Determination with only two minor revisions). Instead, the CO forwarded the June 12, 2012 email to the SDD's counsel, asking if the email could "reinforce *our case*?" AR Tab 161 at 2631 (emphasis added). Under FAR § 19.602-4(a), however, the CO was required to consider and determine whether NEIE was, in fact, responsible in light of that new information. The record clearly demonstrates that the CO neglected to do so.

Federal courts have found agency decisions to be arbitrary and capricious, if an agency's explanation does not adequately address the evidence before it. *See, e.g.*, *Amazon Web Servs., Inc. v. United States*, ___ Fed. Cl. ___, 2013 WL 5952468, at *8 (2013) (holding that an agency's failure to consider the threshold issue of prejudice was, "by itself, sufficient to render the [agency's] decision arbitrary and capricious" (internal quotations omitted)). The conclusions reached in the CO's May 25, 2012 Determination of Non-Responsibility "run counter to the evidence before [her]." *Ala. Aircraft Indus.*, 586 F.3d at 1375 (*quoting State Farm*, 463 U.S. at 43).

Specifically, NEIE's May 14, 2012 explanation that a number of corporate issues were pending because of the probate process explains why NEIE could not update various government databases.[29] The CO rejected this explanation first because the February 16, 2012 CCR update for NEIE Medical Waste "[did] not reference James Coleson as a point of contact."[30] AR Tab 149A at 2355. But the CO did not have any rational basis for concluding that NEIE Medical Waste was "owned by James Coleson." AR Tab 149A at 2192.17 (explaining that NEIE Medical Waste Services was a distinct company because four veterans bought out James Coleson's share before his death). *Cf. State Farm*, 463 U.S. at 43 (finding that "entirely fail[ing] to consider an important aspect of the problem" is arbitrary and capricious). The CO knew or should have known that NEIE Medical Waste was a separate business entity from NEIE. AR Tab 149A at 2192.17 (5/11/12 email to the CO stating that NEIE Medical Waste Services was

25, 2012 Determination of Non-Responsibility, the court does not review those documents as to the issue of whether the initial Determination was arbitrary and capricious.

[29] In the May 25, 2012 Determination of Non-Responsibility, the CO included, as an exhibit, NEIE's February 6, 2012 response to the Guardian protest, along with copies of the February 22, 2012 and March 14, 2012 emails sent to the CO by NEIE on May 11, 2012. AR Tab 154.11 (Exhibit 11). In the "Contracting Officer's Analysis of Facts" in the Determination, however, the CO never addresses these documents or the potentially exculpatory information contained therein. AR Tab 154 at 2354–56.

[30] The United States Court of Federal Claims previously has rejected the idea that government agencies rely on the CCR or that failure to keep a CCR profile up-to-date would amount to suspicious activity, no less conduct that evidences a lack of integrity or business ethics. *See Reema Consulting Servs.*, 107 Fed. Cl. at 531–32 ("There is no indication that the system was also to be used in examining proposals. . . . Accordingly, there is utterly no reason to believe that [the contractor's] failure to list any particular information in its CCR profile should have engendered suspicions[.]").

acquired by other disabled veterans prior to James Coleson's death).  In addition, allegations of unethical behavior by a different corporate entity cannot, without more, be attributed to another. *See CSE Constr. Co. v. United States*, 58 Fed. Cl. 230, 260–61 (2003) (finding the denial of a contractor's application for a COC to be  arbitrary and capricious because the SBA failed to consider whether negative comments of a contractor's past performance were due to circumstances beyond the contractor's control).  The CO also discounted NEIE's May 14, 2012 explanation because the explanation "contradicts" the fact that an employee of NEIE advised the CO that "'someone' told [NEIE] to leave the [government database] certifications as is for NEIE, Inc. because of two ongoing procurements." AR Tab 154 at 2355.  This "fact," however, is mere "speculation and innuendo" that does not evidence wrongdoing by NEIE.  *See Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 768 (2006) ("In the case at hand, some facts material to the Contracting Officer's decision were demonstrably erroneous and other aspects of her decision have no basis apart from speculation and innuendo.").

As to the accusations concerning the January 19, 2012 DUN & BRADSTREET report, the CO knew or should have known that NEIE had no control over that information.  AR Tab 149A at 2192.11 (explaining, in a letter provided to the CO on May 11, 2012, that NEIE had no control over the DUN & BRADSTREET database).

Finally, the CO's claim that NEIE engaged in wrongdoing by "attempt[ing] to 'transfer' ownership of NEIE to a different veteran" is unfounded and lacks a rational basis.  AR Tab 154 at 2355 (referencing a 7/6/11 email from Christopher Coleson to the CO).  On its face, the email at issue does not support the CO's claim.  AR Tab 64 (failing to name the owner, indicate that the owner is a veteran, or even suggest that NEIE attempted to "transfer" ownership to regain SDVOSB status).  More importantly, the Government has not established that a corporation may not attain SDVOSB status by transferring ownership to a service-disabled veteran.  *See* 13 C.F.R. § 125.8(g) (defining an SDVOSB as a small "concern" wherein "[n]ot less than 51% of which is owned by one or more service-disabled veterans" who manage and control daily business operations).

In sum, the CO's May 25, 2012 Determination of Non-Responsibility recites the allegations contained in the Guardian's January 19, 2012 protest[31] and Guardian's May 21, 2012 agency-level protest without any independent reasoned analysis or attempt to address NEIE's counter-arguments.  *Compare* AR Tab 123 at 1989–90 (Guardian's 1/19/12 protest) *and* AR Tab 152.1 at 2228–29 (Guardian's 5/21/12 agency-level protest), *with* AR Tab 154 at 2351–52 (Non-Responsibility Determination) (listing six "highly disconcerting misstatements by NEIE" described by Guardian but never mentioning anything from NEIE's February 6, 2012 response to Guardian's 1/19/12 protest, provided to the CO by NEIE on 5/11/12).

As a matter of law, allegations concerning a contractor's business ethics or integrity must be of a "cause of so serious or compelling a nature that it affects the present responsibility of the contractor."  48 C.F.R. § 9.406-2(c).  The allegations in the May 25, 2012 Determination of Non-Responsibility do not meet that standard.  The Government's Reply discusses a list of cases

---

[31] The CO attached Guardian's January 19, 2012 protest as an exhibit to the May 25, 2012 Determination of Non-Responsibility.  AR Tab 154.7a & 154.7b (Exhibit 7).

where inquiry into a contractor's integrity and business ethics was warranted. Gov't Reply 12 (citing *Standard Tank Cleaning Corp.*, B-245364, 1992 WL 5586, at *1 (Comp. Gen. Jan. 2, 1992) (multiple environmental citations); *Garten-und Landschaftsbau GmbH Frank Mohr*, B-237276, 1990 WL 277689, at *2 (Comp. Gen. Feb. 13, 1990) (lying to criminal investigators); *River Equip. Co.*, B-227066, 1987 WL 102593, at *4 (Comp. Gen. July 24, 1987) (surety's nondisclosure of outstanding financial obligations); *General Painting Co.*, B-219449, 1985 WL 53542, at *3 (Comp. Gen. Nov. 8, 1985) (failure to pay minimum wage)). These cases, however, concern conduct in serious violation of the law evidencing a lack of "moral soundness" and "corrupting influence or practice" that warrants inquiry into business ethics and integrity. *See Domoco Chem. Corp.*, 48 Comp. Gen. 769, 769 (1969) (defining the term "integrity" in the context of government contracts). NEIE's conduct was neither illegal nor even marginally unethical. The only charge of any substance was the CO's accusation that Christopher Coleson falsified an ORCA certification for NEIE Medical Waste. AR Tab 154 at 2355. Not only was that charge false, but the CO knew or should have known that NEIE Medical Waste Services and NEIE were distinct corporate entities with separate ownership. AR Tab 161 at 2632 (explaining that NEIE Medical Waste was independently owned); AR Tab 191 at 2871 (same). Most importantly, even if NEIE had done all that the CO had accused NEIE of doing, none of it amounted to an ongoing issue of integrity and ethics that would affect NEIE's *present* responsibility, particularly because NEIE explained the database errors and corrected the misunderstanding surrounding James Coleson's death.

Moreover, as a matter of law, accusations about business integrity require at least a modicum of due process. *See Old Dominion Dairy Prods.*, 631 F.2d at 968 ("[D]ue process . . . includes the right to be notified of the specific charges concerning the contractor's alleged lack of integrity, so as to afford the contractor an opportunity to respond to and attempt to persuade the contracting officer, in whatever time is available, that the allegations are without merit."); *see also Afghan Am. Army Servs.*, 106 Fed. Cl. at 727 (observing that "the contracting officer should have obtained additional information," because "information available in the record was 'sufficient to put the contracting officer on notice to inquire further'" (quoting *Schwendener/Riteway Joint Venture*, B-250865 et al., 1993 WL 67747, at *5 (Comp. Gen. Mar. 4, 1993)).[32] In this case, the CO had ample opportunity to request additional information from NEIE to avoid any potential misunderstanding. The EPA identified NEIE as the prospective awardee on January 18, 2012. AR Tab 118 at 1980. The SBA resolved the Guardian Protest on April 30, 2012. AR Tab 138 at 2126. The CO withdrew the May 25, 2012 Non-Responsibility Determination on June 29, 2012[33] and issued the revised Determination of Non-Responsibility

---

[32] The Government cites *John C. Grimberg Co.* for the proposition that contracting officers "are not required to seek additional information" before issuing a non-responsibility determination. *See* Gov't Cross Mot. JAR 32 (citing *John C. Grimberg Co.*, 185 F.3d at 1303). While generally true, the facts here are distinguishable because, in this case, the accusations relate to integrity, additional information in the record put the CO on notice to make further inquiries, and the CO had ample opportunity to request additional information.

[33] The CO first informed the SBA about the need to revise the May 25, 2012 Non-Responsibility Determination on June 29, 2012 and then requested, on July 5, 2012, that the SBA withhold a decision pending those revisions. AR Tab 166 at 2713.

on July 24, 2012.  AR Tab 169 at 2734.  But, at no point before the initial Non-Responsibility Determination or before the revised Non-Responsibility Determination did the CO request that NEIE respond to the allegations of unethical conduct in the CO's revised Determination.  To the contrary, immediately after issuing the May 25, 2012 Non-Responsibility Determination the CO evaded NEIE's inquiry about the status of the SDVOSB Contract award and did not inform NEIE of the revised Determination.  AR Tab 155 at 2589 (responding to a May 29, 2012 email from NEIE by stating that "NEIE will be notified when there is a change to [the] status [of the SDVOSB set-aside]"); *Afghan Am. Army Servs.*, 106 Fed. Cl. at 726 ("This rush to judgment without obtaining a more complete picture of what transpired was arbitrary and capricious.").  And, given the uncertainty surrounding the allegations (the reason for copying James Coleson on emails, the corporate relationship between NEIE, Inc. and NEIE Medical Waste, and the status of James Coleson's probate), the CO should have been on notice, as was the contracting officer in *Afghan American Army Services*, to make further inquiries.

For the reasons discussed herein, the court finds that the May 25, 2012 Determination of Non-Responsibility and the revised July 24, 2012 Determination of Non-Responsibility lacked a rational basis.[34]  Furthermore, the CO failed to consider new material information as required by

---

[34] The Government also argues, in a footnote in its June 28, 2013 Cross-Motion, that NEIE's challenge to EPA's nonresponsibility determination is untimely.  Gov't Cross Mot. JAR 23 n.10 ("If NEIE wanted to protest EPA's decision to declare [NEIE] nonresponsible, [NEIE] should have done so months ago, at the time EPA determined that [NEIE] was ineligible.  Instead, NEIE waited to file its protest until after EPA decided not to award the contract at all."); *see also* Gov't Reply 4 (referencing again NEIE's "untimely attack upon EPA's nonresponsibility determination").

Besides failing to cite a single authority for its proposition that NEIE's arguments concerning the CO's Determination of Non-Responsibility are untimely, the Government ignores the fact that the EPA strung along NEIE for months before finally refusing to award it the SDVOSB Contract.  The Administrative Record confirms that NEIE followed agency procedures by applying for a Certificate of Competency immediately after learning of the Non-Responsibility Determination.  *See* 48 C.F.R. § 19.602-2 (allowing a small business to apply for a Certificate of Competency to challenge the contracting officer's determination); AR Tab 191 at 2863–74 (NEIE's June 19, 2012 application for a Certificate of Competency).  It was the agency, not NEIE, that acted in an untimely fashion.  AR Tab 155 at 2590 (declining to tell NEIE, in an email exchange four days after issuing the Non-Responsibility Determination, of that fact); AR Tab 166 at 2713 (requesting that the SBA withhold a decision on NEIE's application); AR Tab 167 at 2715 (requesting an additional week from the SBA to revise the May 25, 2012 Non-Responsibility Determination); AR Tab 170 at 2735 (delaying to forward the revised Non-Responsibility Determination to the SBA for two weeks, citing an "oversight").  The EPA compounded this delay by simultaneously proposing NEIE for debarment, an action that took several more months to resolve.  AR Tab 184 (8/2/2012 Notices of Proposed Debarment).  Only after the EPA refused to award the SDVOSB Contract to NEIE did it become clear, as a practical and legal matter, that NEIE had no other recourse but litigation.  AR Tab 220 (declining to award the SDVOSB Contract); AR Tab 227 and 228 (stating, in a 1/15/13 email exchange, that NEIE was ineligible to receive the SDVOSB Contract); AR Tab 237 at 3175 (following the termination of NEIE's proposed debarment, informing NEIE on 2/12/13 that NEIE remained ineligible to

FAR section 19.602-4(a).   Therefore, the court does not need to consider the circumstances surrounding the August 2, 2012 Notice of Proposed Debarment[35] or the allegations in the June 10, 2013 Amended Complaint as to the covenant of good faith and fair dealing.[36]

On February 12, 2013, the CO advised NEIE that the EPA decided not to proceed to award a contract under the SDVOSB set-aside.  AR Tab 237 at 3175.  As a general matter, an agency decision to cancel a solicitation is entitled to substantial deference.  *See Cygnus Corp. v. United States*, 72 Fed. Cl. 380, 385 (2006) ("[C]ancellation of an RFP is . . . given a great deal of discretion, especially where, as in this case, the solicitation explicitly permits the agency to make no award at all."), *aff'd* 227 Fed. App'x 909 (Fed. Cir. 2007).  As a matter of law, however, the United States Court of Appeals for the Federal Circuit has held that "pretextual" justifications for cancellation of a procurement violate the agency's "duty to conduct a fair procurement."  *Parcel 49C*, 31 F.3d at 1151 ("Without a valid reason for cancelling the procurement . . . the Government violated its duty to conduct a fair procurement."); *see also 126 Northpoint Plaza Ltd. P'Ship v. United States*, 34 Fed. Cl. 105, 112 (1995) (determining that an agency "is not vested with unfettered discretion to cancel procurements"); *P. Francini & Co., Inc. v. United States*, 2 Cl. Ct. 7, 10 (1983) ("To have a set of bids discarded after they are opened and each bidder has learned his competitor's prices is a serious matter, and it should not be permitted except for cogent reasons." (quoting *Massman Constr. Co. v. United States*, 102 Ct. Cl. 699, 719 (1945))).

The court, however, cannot compel the EPA to award NEIE the SDVOSB Contract.  *See, CACI*, 719 F.2d at 1575 (stating that "a disappointed bidder has 'no right . . . to have the contract awarded to it'" (alteration in original) (quoting *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859, 864

---

receive the SDVOSB Contract).   Therefore, the court finds the Government's argument concerning the timeliness of NEIE's challenge to be without merit.

[35] Debarments are not meant to punish contractors and as such, are only forward-looking. 48 C.F.R. § 9.402 (limiting the use of debarment for protection of the public interest and "not for purposes of punishment").  Absent the arbitrary and capricious action by the CO in this case, EPA would have awarded NEIE the contract shortly after resolving the Guardian protest on April 30, 2012, before any proposed debarment.  *See* AR Tab 157 at 2602 ("No impediment to award exists other than the decision on responsibility matters.").  Thus, even assuming that the August 2, 2012 Notice of Proposed Debarment was not arbitrary and capricious, the proposed debarment was prospective only and as such, still would not have impacted NEIE's ability to perform the SDVOSB Contract.

[36] The court is particularly troubled by the CO's Declaration, submitted under penalty of perjury, representing: "I had no involvement in Plaintiff's debarment proceedings at the SDD." Gov't Resp. Suppl. AR at Ex. A (May 23, 2013 Decl. of Ms. Giacobbe).  The Administrative Record contains several examples of the CO interacting with the SDD counsel in a manner where it appears that the CO was attempting to influence the debarment process.  AR Tab 161 at 2631 (asking the SDD counsel if an email exchange between NEIE and a reporter could be "use[d] . . . to reenforce [sic] our case?"); AR Tab 159 at 2615 (forwarding a magazine profile of Chris Coleson with the comment, "I'll allow you to draw your own conclusions").

(D.C. Cir. 1970))).  In the court's judgment, however, the EPA's February 12, 2013 decision to not proceed to award a contract under the SDVOSB set-aside appears to be completely post-hoc.  *See Parcel 49C*, 31 F.3d at 1151 (holding that "pretextual and incredible" justifications for cancellation of a procurement violates the agency's "duty to conduct a fair procurement"); *126 Northpoint Plaza*, 34 Fed. Cl. at 112 (finding that an agency "is not vested with unfettered discretion to cancel procurements").

On June 28, 2013, however, the Government represented to the court that "EPA Region 2 is in the acquisition planning stage for the follow-on ERRS contracts."  Gov't Resp. 21 n.7.  According to the Government, EPA plans to issue the new Solicitation "during the first quarter of fiscal year 2014" and that "NEIE is free to submit a proposal for this contract."  Gov't Cross Mot. JAR 21 n.7; *see also* Gov't Reply 3 n.1 (reiterating that the follow-on contract solicitation is expected during the first quarter of fiscal year 2014).  If a new Solicitation is indeed issued in 2014, the court expects that any proposal submitted by NEIE will be evaluated without consideration of the prior unlawful, ill-considered, and erroneous factual non-responsibility and proposed debarment made by the Agency in this case.

Therefore, the court denies NEIE's request for an injunction requiring the EPA to reopen the award process for the SDVOSB Contract, because the Government has represented to the court that the EPA will fairly consider NEIE's proposal for any ERRS contracts.

## IV.  CONCLUSION.

For the foregoing reasons, the Plaintiff's May 17, 2013 Motion for Judgment On The Administrative Record is granted in part.  On or before **January 21, 2014**, Plaintiff may submit a motion for bid and proposal costs.  *See, e.g.*, *Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 629, 630–31 (2002) ("To be awarded bid and proposal costs in a successful bid protest action, the contractor must show those bid and proposal costs to be allocable and reasonable." (citing *Coflexip & Servs., Inc. v. United States*, 961 F.2d 951, 953 (Fed. Cir. 1992) ("Recovery can be obtained [for proposal preparation costs] if the government breached an implied-in-fact contract to treat a bid honestly and fairly, in which case its conduct was arbitrary and capricious toward the bidder-claimant." (internal quotations omitted)))).  In addition, on that date, Plaintiff may file a motion for attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, if applicable.

**IT IS SO ORDERED.**

s/ Susan G. Braden

**SUSAN G. BRADEN**
**Judge**